**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

WELSPUN PIPES, INC., and                                          PLAINTIFFS
WELSPUN TUBULAR, LLC

v.                                       No. 4:13CV00418 JLH

LIBERTY MUTUAL FIRE
INSURANCE COMPANY                                                 DEFENDANT

## OPINION AND ORDER

The plaintiffs, Welspun Pipes, Inc., and Welspun Tubular, LLC, suffered an interruption in business due to a fire that damaged a facility in Little Rock, Arkansas, while the facility was covered by a commercial insurance policy issued by Liberty Mutual Fire Insurance Company. The plaintiffs contend that, as a result of the fire, they incurred expenses in mitigating their business loss that are covered under the policy which Liberty Mutual has refused to pay. Liberty Mutual denies that the mitigation expenses at issue are covered; it contends that it has paid all of the covered losses. The parties have submitted cross motions for summary judgment. For the reasons to be explained, Liberty Mutual's motion for summary judgment is granted, while the plaintiffs' motion is denied.

## I.  SUMMARY JUDGMENT STANDARD

A court should grant summary judgment if the evidence demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine dispute for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). If the moving party meets that burden, the nonmoving party must come forward with specific facts that establish a genuine dispute of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986);

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). A genuine dispute of material fact exists only if the evidence is sufficient to allow a reasonable jury to return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). The Court must view the evidence in the light most favorable to the nonmoving party and must give that party the benefit of all reasonable inferences that can be drawn from the record. *Pedersen v. Bio-Med. Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015). If the nonmoving party fails to present evidence sufficient to establish an essential element of a claim on which that party bears the burden of proof, then the moving party is entitled to judgment as a matter of law. *Id.*

Local Rule 56.1 provides that a party moving for summary judgment must annex to the motion a separate, short and concise statement of the material facts as to which it contends that there is no genuine issue to be tried. The rule adds that a nonmoving party who opposes the motion must file a separate, short and concise statement of the material facts as to which it contends a genuine issue exists to be tried. Any material facts stated by the moving party are deemed admitted unless controverted by the statement filed by the nonmoving party.

## II. UNDISPUTED FACTS

### A. Relevant History

The plaintiffs are subsidiaries of Welspun Corp. Ltd., a global pipe manufacturer based in India. Lib. Mut.'s Mot. for S.J., Ex. 1, Chokhani Dep. at 94-95. Welspun Corp. is the parent company of a group of pipe manufacturers. *Id.* This group includes plaintiff Welspun Pipes, Inc., a pipe manufacturer based in the United States, and Welspun Tradings Ltd., a pipe manufacturer based in India. *Id.*, Ex. 2, Johnson Dep. at 129. Welspun Pipes, in turn, wholly owns Welspun

2

Tubular, LLC, and Welspun Global Trade, LLC.  Pl.'s Resp. to Def.'s Undisp. Mat. Facts at 1 ¶¶ 2-3.  Welspun Tubular manufactures pipes in Little Rock, Arkansas, while Welspun Global is the marketing arm of Welspun Pipes and is responsible for negotiating and securing purchase orders, which are fulfilled by Welspun facilities such as Welspun Tubular.  *Id.*

In April 2012, Enterprise Products Partners circulated a "Request for Quote Package for the Seaway Expansion Project."  Lib. Mut.'s Mot. for S.J., Ex. 4 at Seaway 000005.  The Seaway project planned to stretch 670 miles of pipeline from Cushing, Oklahoma, to Houston, Texas.  *Id.* at Ex. 5, Ohlsson Dep. at 26-28.  Enterprise was the construction manager for the project.  Pl.'s Resp. to Def.'s Undisp. Mat. Facts at 3, ¶ 10.  Welspun Global bid on the project, and in May 2012, Enterprise awarded six segments of the project—approximately 220 metric tons of Helically Submerged Arc Welded (HSAW) pipe—to Welspun, worth nearly $330 million.  *Id.* at 3, ¶¶ 13-14.  After awarding the project to Welspun, Enterprise asked whether Welspun could produce a portion of the pipe as Longitudinal Submerged Arc Welded (LSAW) instead of HSAW.  *Id.* at 6, ¶ 20.  Joel Johnson, a Welspun Global executive, informed Enterprise that Welspun Tubular could not produce that type of pipe but that Welspun Tradings could.  *Id.* at 6-7, ¶¶ 21-22.  Welspun and Enterprise agreed to revise the order.  *Id.* at 7, ¶ 23.  The revision shifted 36,592 metric tons of pipe from production at Welspun Tubular in Little Rock to production at Welspun Tradings  in India.  *Id.* Johnson told Enterprise that the shift would result in no additional cost to Enterprise.  *Id.* at 7, ¶ 24. With this shift in production to India, the Seaway order required the plaintiffs to deliver approximately 180,000 metric tons of HSAW pipe on a rolling basis with delivery to be completed by August 31, 2013.  Pl.'s St. of Mat. Facts at 2, ¶ 10.

Production for the project was scheduled to begin on July 25, 2012, with final delivery on August 31, 2013.  Pl.'s Resp. to Def.'s Undisp. Mat. Facts at 7-8, ¶¶ 25-27.  On July 14, 2012, a fire damaged Welspun's Little Rock facility.  *Id*. at 7-8, ¶¶ 25-27.  The damage caused Welspun to cease production until repairs could be made.  *Id*. at 8, ¶ 28.  At the time of the fire, Welspun Tubular had three outstanding purchase orders: the Seaway order, an order from Access NEX, and an order from AB-BC.  Pl.'s Mot. for S.J., Ex. 2, Chokhani Dep. at 36.  To fulfill these orders, Welspun Tubular was scheduled to be at full production capacity for the next 12 months, beginning from the time of the fire.  Lib. Mut.'s Mot. for S.J., Ex. 7, Bredeson Rep. at 3.

Welspun Tubular promptly notified Enterprise of the fire.  Pl.'s Resp. to Def.'s Undisp. Mat. Facts at 8-9, ¶ 30.  Although Welspun Tubular had a purchase order with Enterprise and the parties had prepared a written contract, the written contract had not been executed.  Lib. Mut.'s Mot. for S.J., Ex. 12 at Welspun 001179.  Nevertheless, Welspun Tubular gave notice that it was invoking the force majeure provision in the unexecuted contract.  *Id.*  Despite that notice, Welspun Tubular offered Enterprise two solutions to side-step the force majeure issue.  Pl.'s Mot. for S.J., Ex. 7, Johnson Dep. at 51.  Johnson testified that Welspun Tubular first sought to revise the delivery deadlines but Enterprise rejected this proposal.  *Id*., Johnson Dep. at 51-52.[1]  Welspun Tubular then proposed shifting a portion of the production to Welspun Tradings in India.  *Id.*, Johnson Dep. at 53.  The shift was proposed to allow Welspun Tubular to meet the purchase order's delivery deadlines.  Pl.'s Mot. for S.J., Ex. 13, Johnson Email at Welspun 003009.  Whereas the original plan was for the Little Rock facility to produce pipe for the Seaway project intermittently—in July, October and

---

[1] Although Johnson testified that he made this proposal in writing in an email, the plaintiffs have not produced any documentary evidence of this proposal.

December of 2012 and March through August of 2013—the proposed schedule, with part of the production shifted to India, provided for a "single rolling campaign" in which the Little Rock facility would produce pipe for the Seaway project from mid-February of 2013 through August of 2013. *Id*. at 3009 and 3012.  Welspun Tubular asked Welspun Tradings to agree to the shift in order to prevent Welspun from losing the entire Seaway order, and it assured Welspun Tradings that it would bear all additional costs incurred as a result of the shift.  Pl.'s Mot. for S.J., Ex. 9, Chokhani Letter, August 5, 2012.  Enterprise and Welspun Tradings agreed to the shift. Pl.'s Mot. for S.J., Ex. 12, Johnson Email at Welspun 045259-60; Pl.'s Resp. to Def.'s Undisp. Mat. Facts at 12, ¶¶ 40-41.  The result was a second shift in production of approximately 40,000 metric tons of pipe to India.  Lib. Mut.'s Mot. for S.J., Ex. 15, Ben-Ami Rep. at 6.

At the time of the fire, the Welspun Pipes facility in Little Rock was covered by a commercial insurance policy issued by Liberty Mutual Fire Insurance Company.  Pl.'s Mot. for S.J., Ex. 1.  The policy provided coverage for real property and personal property, equipment breakdown, loss of business income, which included necessary expenses incurred that reduced the loss of business income, and extra expenses.  *Id*. at LM 000014.  The coverage limit for loss of business income was $68,128,941; its coverage limit for extra expenses was $1,000,000.  *Id.* at LM000017.

In August of 2016, Welspun Pipes retained PriceWaterhouseCoopers, LLP, a forensic accounting firm, to assist it in calculating and submitting a claim for lost business income.  Pl.'s Resp. to Def.'s Undisp. Mat. Facts at 16, ¶ 47.  On behalf of Welspun, the forensic accountants submitted two preliminary claims for real and personal property damage, lost business income, mitigation expenses, and extra expenses—one on September 21, 2012, and another on November 15, 2012, Pl.'s Resp. to Def.'s Undisp. Mat. Facts at 17, ¶ 52, and at 20, ¶ 61.  The latter submission

claimed a business income loss of approximately $28,000,000 as well as an estimated $14,500,000 in what Welspun Pipes characterized as mitigation expenses. *Id.* at ¶ 61. These expenses resulted from the incremental costs, such as steel price differential, excess freight, and double-jointing and coating costs, associated with the second shift of production to Welspun Tradings. Lib. Mut.'s Mot. for S.J., Ex. 15, Ben-Ami Rep. at 7. Welspun claimed that it incurred the estimated $14,500,000 in order to mitigate its loss of business income—in other words, if it had not spent the $14,500,000 to shift the pipe production to Welspun Tradings, it would have been at risk of losing the entire Seaway order. *Id.* at 6. Marc Ben-Ami, the plaintiffs' forensic accountant, has since reported that the plaintiffs incurred actual mitigation expenses of $13,413,882 in direct costs and $495,193 in indirect, overhead costs. *Id.* at 2-3. Liberty Mutual paid a portion of the direct costs—$413,432—as "Extra Expenses,"[2] so, according to Ben-Ami, the unpaid direct mitigation costs total $13,000,450. *Id.* at 2. The indirect, overhead costs of $495,193 have not been paid. *Id.* at 3.

Liberty Mutual disagreed with Welspun's calculation of its loss of business income and its characterization of the expenses associated with the shift as necessary expenses. Liberty Mutual agreed that the policy provided coverage for the expenses but considered them "Extra Expenses" subject to the $1,000,000 policy limit. Pl.'s Mot. for S.J., Ex. 14. Despite this disagreement, the parties reached a partial settlement in which Liberty Mutual paid Welspun's loss of business income claim in the amount of $22,300,026 and a total of $1,000,000 for what Liberty Mutual characterized as the insured's "Extra Expense" claim. *Id.* The partial settlement agreement acknowledged that Liberty Mutual and Welspun disagreed over the characterization of the expenses and that a dispute

---

[2] Liberty Mutual also paid $586,568 in storage build-out costs as "Extra Expenses." *Id.* Thus, Liberty Mutual paid the policy limit of $1,000,000 for "Extra Expenses."

remained as to Welspun's claim for mitigation expenses. *Id.* The plaintiffs commenced this action to resolve that dispute.

**B.      Relevant Policy Provisions**

The relevant portions of the insurance policy[3] provide:

C.      If coverage for loss of **business income** is provided . . . , we will pay for:

1.      The actual loss of **business income** you incur during a **period of restoration** directly resulting from damage by a **peril insured against** to the type of property covered by this policy at a **covered location**.

2.      The necessary expenses **you** incur in excess of **your** normal operating expenses that reduces **your** loss of **business income**. **We** will not pay more than **we** would pay if **you** had been unable to make up lost production or continue operations or services.

*   *   *

5.      In determining the actual loss of **business income**, consideration must be given to:

a.      The experience of the business before the loss and the probable experience after the loss;

b.      The continuation of only those normal charges and expenses that would have been incurred had no interruption of production or suspension of business operations or services happened;

c.      The demonstration of an actual loss of sales, income, or rental income; and

d.      Any amount recovered, at selling price, for loss or damage to merchandise that will be considered to have been sold.

6.      **We** will not pay unless **you** are wholly or partially prevented from:

a.      producing goods; or

b.      continuing business operations or services.

---

[3] The policy is Exhibit 1 to the plaintiff's motion for summary judgment.

7.      **You** are required to mitigate **your** loss by:

      a.      Making up lost production within a reasonable period of time not limited to the **period of restoration**.

      b.      Continuing business operations or services during the **period of restoration**.

      c.      Using any property or service:

            (1) owned or controlled by **you**; or

            (2) obtainable from any other sources.

      d.      Working extra time or overtime.

      e.      Using inventory.

**We** will not pay for any loss to the extent it can be reduced through these or any other means whether at a **covered location** or at any other location.

8.      **We** will not pay for:

\* \* \*

      b.      Any increase in loss due to:

            (1) suspension, cancellation or lapse of any lease, contract, license or order.

\* \* \*

9.      The most **we** will pay for a loss under this coverage is the lesser of:

      a.      **Your** actual loss of **business income** and necessary expense; or

      b.      the applicable **limit of liability** . . . .

D.      If coverage for **extra expense** is provided . . . , we will pay for:

1.      The actual **extra expense** you incur during a **period of restoration** directly resulting from damage by a **peril insured** against to the type of property covered by this policy at a **covered location**.

\* \* \*

3.      We will not pay for:

8

a.     Loss of **business income**.

b.     Costs which would have been incurred in conducting **your** business during the same period had no **covered loss** happened.

\* \* \*

e.     Any increase in loss due to:

(1) suspension, cancellation or lapse of any lease, contract, license or order.

\* \* \*

A.     Standard Extensions of Coverage

In the event of a **covered loss**, the coverage provided by this policy is extended as follows:

\* \* \*

7.     Extended **Period of Restoration**

a.     If loss of **business income** coverage is provided, **we** will pay the actual loss of **business income you** sustain due to a reduction in sales, earnings or rental income that directly results from direct physical loss or damage to **your covered property** by a **peril insured against**, for the additional time required, when **you** use reasonable speed, to restore **your** business to the condition it would have been in if no loss had occurred. This additional time starts with the time when the **period of restoration** would end, and continues for no more than sixty (60) consecutive days immediately following the **period of restoration**.

\* \* \*

**DEFINITIONS**

\* \* \*

D.     **Business income** means:

Gross earnings, including rental income, plus all other earnings derived from the operation of the business, less all charges and expenses which do not necessarily continue.

For example:

1.     Manufacturing operations:

The net sales value of production less the cost of all raw stock, materials and supplies utilized in such production.

9

\* \* \*

L.     **Extra expense** means the reasonable and necessary extra costs:

  1.     Incurred to temporarily continue as nearly normal as practicable the conduct of **your** business; or

  2.     Of temporarily using property or facilities of **yours** or others.

  3.     For purposes of applying the above provision "normal" means the condition that would have existed had no **covered loss** happened.

\* \* \*

B.B.    **Period of restoration** means:

  1.     For buildings and equipment, the period of time

    a. starts at the time of a **covered loss** and,

    b. ends when using reasonable speed the building and equipment could be:

      (1) repaired or replaced; and
      (2) made ready for operations;

    under the same or equivalent physical operating conditions that existed prior to the damage.

## III.  APPLICATION OF THE LAW TO THE FACTS

Where, as here, the Court's jurisdiction is based on diversity of citizenship, state law controls the interpretation of an insurance policy. *Midwest Regional Allergy v. The Cincinnati Ins. Co.*, 795 F.3d 853, 856 (8th Cir. 2015).  In Arkansas, construction of clear and unambiguous contract language is a question of law for the court. *See Nat'l Life & Accident Ins. Co. v. Abbott*, 248 Ark. 1115, 1117, 455 S.W.2d 120, 122 (1970).  Arkansas law also entrusts to courts the initial question of whether an ambiguity exists. *C. & A. Constr. Co. v. Benning Constr. Co.*, 256 Ark. 621, 622, 509 S.W.2d 302, 303 (1974).  An ambiguity exists where a provision is susceptible to more than one reasonable interpretation. *State Farm Fire & Cas. Co. v. Midgett*, 319 Ark. 435, 438, 892 S.W.2d

469, 471 (1995).  In such a case, "[a]n insurance contract is to be construed strictly against the insurer."  *Ingram v. Life Ins. Co. of Ga.*, 234 Ark. 771, 773, 354 S.W.2d 549, 550 (1962).  However, courts interpret unambiguous contract provisions using the plain, ordinary, and popular sense of the terms, without resorting to rules of construction.  *See Elam v. First Unum Life Ins. Co.*, 346 Ark. 291, 297, 57 S.W.3d 165, 169 (2001); *Norris v. State Farm Fire & Cas. Co.*, 341 Ark. 360, 363, 16 S.W.3d 242, 244 (2000).  Faced with unambiguous provisions, "the duty of the courts [is] to give effect to the plain wording of the policy."  *Ingram*, 234 Ark. at 773, 354 S.W.2d at 550; *see also S. Farm Bureau Cas. Ins. Co. v. Reed*, 231 Ark. 759, 763, 332 S.W.2d 615, 618 (1960).  An insured bears the burden of proving coverage under the policy, while the insurer bears the burden of proving the applicability of an exclusion from that coverage.  *Reed*, 231 Ark. at 763-64, 332 S.W.2d at 617-18.

The central issue is whether the expenses incurred by Welspun in shifting the cost of production of a portion of the pipes for the Seaway project to India are covered under paragraph C.2 of the policy.  Paragraph C.2 provides coverage for necessary expenses incurred by an insured to reduce the loss of business income, with the caveat that Liberty Mutual will not pay more than it would have paid if the insured had been unable to make up the lost production or continue operations or services.  The shifting of production to India resulted in Welspun spending approximately $14,500,000 that it otherwise would not have spent.  The plaintiffs contend that this shift was necessary in order to avoid losing the entire Seaway order.[4]

---

[4] The evidence is in dispute as to whether there was a genuine risk that the Seaway order would have been lost, but for purposes of ruling on summary judgment, the Court views the evidence in the light most favorable to the plaintiffs.

Business income is defined in the policy as gross earnings less all charges and expenses. For manufacturing operations, business income means the net sales value of production less the cost of all raw stock, materials and supplies used in the production. To show a loss of business income, therefore, a manufacturer such as Welspun must show a decrease in the net sales value of production. To establish a claim under paragraph C.2 of the policy, a manufacturer such as Welspun must show that it necessarily incurred expenses in excess of its normal operating expenses that reduced a decrease in the net sales value of production.[5] The policy covers loss of business income during the period of restoration and the following 60-day extended period of restoration. The parties disagree as to when the period of restoration ended. Liberty Mutual contends that the period of restoration ended on September 25, 2012,[6] whereas the plaintiffs contend that the period of restoration extended into November of 2012. For purposes of ruling on the cross motions for summary judgment, the Court assumes that the plaintiffs are correct that the period of restoration extended into November of 2012. To establish its claim for coverage of necessary expenses under paragraph C.2 of the policy, therefore, the plaintiffs must show that the mitigation expenses claimed avoided a loss of business income, i.e., decrease in the net sales value of production, from the time of the loss through November of 2012 and for a 60-day period thereafter.

---

[5] Paragraph C.2 states, "We will not pay more than we would pay if you had been able to make up lost production or continue operations or services." Welspun's claim is that it averted a loss of business income due to potential lost production, not that it averted a loss of business income due to a failure to continue operations or services, so the question is what Liberty Mutual would have paid if Welspun had been unable to make up the lost production.

[6] Welspun's second, and last, claim submission calculated losses based on a period of restoration ending on September 25, 2012. Lib. Mut.'s Mot. for S.J., Ex. 11, Ben-Ami's Rep. at 164.

The plaintiffs attempt to avoid this conclusion by pointing out that paragraph C.2 does not use the term "covered" nor the terms "period of restoration" or "extended period of restoration." While that is a correct observation, paragraph C.2 nonetheless says that Liberty Mutual will not pay more in mitigation expenses than it would have paid if the insured had been unable to make up lost production or continue operations or services, which means that Liberty Mutual will not pay more than it would have paid had the business loss occurred rather than been averted. Liberty Mutual will pay nothing for a business loss that is not covered, so it will pay nothing to mitigate a business loss that is not covered. "[T]o be recoverable, the mitigation expenses must relate to a covered loss, either existing, or imminent." 11 Steven Plitt, et al., *Couch on Insurance* § 168.11 (2016). It would be absurd to construe the insurance contract to include coverage for expenses incurred to avoid a loss that would not have been covered. *Die-Cutting Diversified, Inc. v. United Mut. Ins. Co.*, 353 F. Supp. 2d 1053, 1058 (E.D. Mo. 2004). An insurance contract should be given a reasonable interpretation, not one that would lead to an absurd conclusion. *Importers' & Exporters' Ins. Co. v. Jones*, 166 Ark. 370, 375, 266 S.W. 286, 288 (1924). Therefore, if an insured incurs mitigation expenses to avoid a business loss that would have occurred after the period of restoration and the extended period of restoration, those mitigation expenses are not covered.

According to the plaintiffs' expert witness, Marc Ben-Ami, if the entire Seaway order had been lost, the plaintiffs would have lost business income in the amount of $69 million. Lib. Mut.'s Mot. for S.J., Ex. 15, Ben-Ami Rep. at 9. Ben-Ami says that Welspun was able to complete approximately 32% of the Seaway order in a 60-day period, so "the $69 million of profits . . . equates to approximately $22 million over a 60-day period." *Id*. Ben-Ami does not tie the averted business loss to the period of restoration, the extended period of restoration, or any identifiable

period of time.  He makes no attempt to show that but for the claimed mitigation expenses the plaintiffs would have suffered a decrease in the net sales value of production during the period of restoration or the extended period of restoration.[7]  According to Ben-Ami, Welspun secured additional contracts for production to take place in late 2013, so "Welspun was considered to be operating at full capacity for the foreseeable future."  Lib. Mut.'s Mot. for S.J., Ex. 15, Ben-Ami Rep. at 4.  The upshot is that the plaintiffs have no evidence that the mitigation expenses at issue averted a net decrease in production value during the period of restoration or the extended period of restoration.  Absent evidence that the mitigation expenses averted a decrease in the net sales value of production during the period of restoration or the extended period of restoration, the plaintiffs cannot present evidence on an essential element of their claim, so their claim must fail.  *Pedersen*, 775 F.3d at 1053.

In addition, paragraph 8.b of the policy provides that Liberty Mutual will not pay for any increase in loss due to the suspension, cancellation or lapse of any contract.  The plaintiffs interpret this provision to mean that the policy does not cover loss for cancellation of a contract if the loss

---

[7] There is evidence that before the fire Welspun intended to produce pipe for the Seaway order from July 19 through August 31 of 2012. Pl.'s Reply to Def.'s Br. in Opp. to Pl.'s Mot. for S.J., Ex. 14, at Welspun 000138.  The loss of production during that period of time was part of Welspun's claim for loss of business income.  That portion of the claim was resolved in the partial settlement agreement.  Welspun also intended to produce pipe for the Seaway order during October and the first three days of November of 2012.  *Id.*  That production would have occurred during the period of restoration or the extended period of restoration.  However, Welspun rescheduled the AB-BC and Access NEX pipe to October.  That pipe was more expensive and resulted in net sales value in production in October of 2012 that was greater than it would have been if Welspun had produced Seaway pipe during that period of time as originally planned.  Pl.'s Resp. to Def.'s Undisp. Mat. Facts at 19-20, ¶ 59.  Welspun characterizes this as "a negative [business income] loss for October because Welspun produced higher priced pipes in October."  *Id.*  In other words, Welspun's net sales value of production was greater in October of 2012 than it would have been if it had produced pipe for the Seaway order during that time.

occurs after the period of restoration or the extended period of restoration.  Br. in Sup. of Pl.'s Resp. to Lib. Mut.'s Mot. for S.J. at 6-9.  Adopting the plaintiffs' construction of this cancelled contract exclusion, there would have been no coverage for loss of the Seaway order except to the extent that cancellation of the contract caused a decrease in net sales value of production during the period of restoration or the extended period of restoration.  Again, the plaintiffs have failed to present any evidence that those mitigation expenses averted a net decrease in sales production during the period of restoration or the extended period of restoration, so, for the reasons explained, the claimed mitigation expenses are not covered.

## CONCLUSION

Because the plaintiffs have presented no evidence to show that the mitigation expenses at issue averted a business loss that would have occurred during the period of restoration or the extended period of restoration, those expenses are not covered under the policy.  Therefore, Liberty Mutual's motion for summary judgment is GRANTED.  Document #72.  The plaintiffs' motion for summary judgment is DENIED.  Document #75.

IT IS SO ORDERED this 2nd day of February, 2017.


_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE